473 So.2d 145 (1985)
Eugenel B. FONTENOT, Plaintiff-Appellee,
v.
HANOVER INSURANCE COMPANY, et al., Defendants-Appellants.
No. 85-274.
Court of Appeal of Louisiana, Third Circuit.
June 26, 1985.
Rehearing Denied August 6, 1985.
Writs Denied October 4, 1985.
*146 Bolen and Erwin, Gregory Erwin, Alexandria, for defendant-appellant.
A. Gaynor Soileau, Ville Platte, for plaintiff-appellee.
Before FORET, LABORDE and YELVERTON, JJ.
LABORDE, Judge.
Plaintiff-appellee Eugenel B. Fontenot sued defendants-appellants Hanover Insurance Company and Audubon Insurance Company for the proceeds of insurance policies covering plaintiff's harvested sweet potatoes and packing materials, which had been destroyed by fire. A jury trial resulted in a verdict for plaintiff. The insurance proceeds and statutory penalties and attorney fees were awarded to plaintiff. We hold that the jury instructions were erroneous. Therefore, the jury verdict must be set aside. On trial de novo on the full record before this court, we enter judgment for the plaintiff for insurance proceeds, but we do not award penalties and attorney fees.
We rendered a previous decision on appeal in this case in which we held that plaintiff had no right of action because he had fully assigned his cause of action to a third party prior to the trial in district court. We reversed the district court judgment and remanded the matter to the district court for a new trial. Fontenot v. Hanover Ins. Co., 465 So.2d 743 (La.App. 3d Cir.1984). On plaintiff's writ, the Louisiana Supreme Court reversed our decision and directed this court further to consider defendants' appeal of the trial court's judgment. Fontenot v. Hanover Ins. Co., 465 So.2d 678 (La.1985).
In the early morning hours of December 22, 1982, a shed in Pine Prairie was destroyed by fire. Mr. Fontenot did not own the shed, but he owned sweet potatoes, packing crates, and pallets which were stored in the shed and also destroyed by the fire. Hanover Insurance Company and Audubon Insurance Company insured Mr. Fontenot against the loss of these potatoes, crates, and pallets, including loss by fire, unless the fire was intentionally set by or on behalf of the insured.
It is beyond serious dispute that the fire resulted from arson. The insurers, after extensive investigation, refused to pay Mr. *147 Fontenot's claim. Mr. Fontenot subsequently filed suit against his insurers. The insurers set forth as an affirmative defense that Mr. Fontenot's dire financial condition, the incendiary origin of the fire, and other circumstantial evidence indicated that Mr. Fontenot was responsible for the destruction of his potatoes and packing materials. The jury found for plaintiff and a judgment was entered in his favor.
Defendants perfected this appeal. Apart from the issue discussed in our previous opinion and disposed of by the Louisiana Supreme Court, defendants contend, in sum, that the following errors were committed by the trial court.
1. The trial judge erred by failing to give complete, appropriate, and correct jury instructions, and further by giving erroneous instructions that confused and misled the jury.
2. The trial judge erred in certain evidentiary rulings which prejudiced the jury's ability to render a fair and impartial verdict.
3. The jury manifestly erred by concluding that plaintiff was not responsible for the fire.
4. The jury erred by concluding that defendants acted arbitrarily, capriciously, or without probable cause in denying plaintiff's claim and therefore the trial court award of penalties and attorney fees is error.
5. The jury erred by awarding excessive damages.
Plaintiff answered defendants' appeal. Plaintiff requests an increase in the award of attorney fees.
We find merit in defendants' first assignment of error. Because of erroneous jury instructions, the verdict in this case must be set aside and given no weight in the further consideration of this case. Defendants' remaining assignments of error lose all relevance once the jury verdict is set aside in this case. Whether by the appellate court (as in this case) or by a subsequent adjudication in the trial court, all issues in a lawsuit must be considered anew after the jury verdict is set aside because of instructional error. Thus, potentially erroneous rulings that result in improper presentation of evidence to the jury, potentially erroneous findings of fact by the jury, and excessive or insufficient awards are all purged from further effect in the case when the verdict is set aside.
It is settled law in Louisiana that a jury verdict must be set aside and given no weight if the jury received erroneous or inadequate instructions as to the law applicable to the case. Thus, if jury instructions contain inapplicable law, omit or misstate applicable law, or through other errors can be said upon a fair reading by an appellate court to be inadequate, confusing, or misleading as to the proper principles of applicable law from the perspective of a lay juror, then the trial judgment cannot stand. See, e.g., Gonzales v. Xerox Corp., 320 So.2d 163, 164-65 (La.1975); Reed v. Gulf Ins. Co., 436 So.2d 580, 584 (La.App. 4th Cir.), writ granted, 441 So.2d 752 (La.1983) (remanding and directing court of appeal to decide case on the record), on remand, 447 So.2d 1102 (La.App. 4th Cir.1984); Keys v. Sambo's Restaurant, Inc. 389 So.2d 1360, 1364-65 (La.App. 3d Cir.1980), aff'd, 398 So.2d 1083 (La.1981); Bond v. Jack, 387 So.2d 613, 614 (La.App. 3d Cir.1980), aff'd, 398 So.2d 1083 (La.1981).
In this case, the factual dispute presented to the jury as to defendant insurers' liability essentially turned on one issue: whether or not plaintiff was responsible for the fire that destroyed his insured potatoes and materials. Undisputedly, defendants provided coverage for loss by fire, whether accidental or through arson by a third party not working in concert with plaintiff. Further, plaintiff's insured property was destroyed by an intentionally set fire. Thus, if the fire is found, under the correct legal standards, to have been set without plaintiff's participation or procurement, then defendant insurers are liable for the proceeds of the policies they issued. On the other hand, if the fire is found, under the correct legal standards, to have been set by or on behalf of plaintiff, then defendant insurers are not liable, and plaintiff *148 cannot recover the proceeds of the policies. Therefore, the dispositive question that determines whether the jury verdict must be set aside in this case is whether the jury was correctly instructed as to the principles of law that guide and control this key factual decision.
Plaintiff sued defendant insurers for the proceeds of the insurance policies under the terms of those contracts. Defendant insurers raised arson by the insured as an affirmative defense to plaintiff's action. As noted by defendants in their brief, the burden of proving arson by the insured rests on defendants. Further, as astutely noted by counsel, defendants' proof of arson necessarily rests on circumstantial evidence. The courts have recognized that arson by an insured will be provable by direct evidence in very few cases. Such fraudulent arson, by its design and nature, will seldom be committed in open daylight, with uninterested witnesses, or without an alibi. Thus, for example, instructions to the jury that failed to state that the insurer's "proof may be and invariably is circumstantial" have been held to be inadequate and in error. Young v. State Farm Fire & Cas. Ins. Co., 426 So.2d 636, 642 (La.App. 1st Cir.1982), writs denied, 433 So.2d 148, 171 (La.1983). Moreover, when evidence is introduced by the plaintiff to show that no criminal charges have been brought against the plaintiff as a result of the fire (which occurred in this case), the jury should be cautioned that the burden of proof in criminal mattersi.e., guilt beyond a reasonable doubtinvolves a far higher onus than that placed upon the affirmative defense claim in a civil casei.e., proof by a preponderance of the evidence.
The trial judge refused to give the following special charge requested by defendants:
"The insurer need not prove its case against the plaintiff beyond a reasonable doubt; it suffices that the evidence preponderates in favor of the defense. Proof, of course, may be and it invariably is, entirely circumstantial and in these circumstances, a finding for defendant is warranted where the evidence is of such import that it will sustain no other reasonable hypothesis but that the plaintiff is responsible for the fire."
This requested charge accurately and unbiasedly reflects the law of this state in terms relevant and applicable to the facts and pleadings in this case. See Rist v. Commercial Union Ins. Co., 376 So.2d 113 (La.1979); Sumrall v. Providence Washington Ins. Co., 221 La. 633, 60 So.2d 68 (1952). Further, the trial judge refused to instruct the jury that satisfactory proof of motive plus proof of the incendiary origin of the fire can fulfill the defendants' burden; that the defendant is not required to show that the insured or someone acting on his behalf actually lit the fire. See Sumrall, 60 So.2d at 70 (motive established by dire financial condition, plus incendiary origin, can fulfill insurer's burden).
Upon our review of the instructions given in this case, we find that the jury was not adequately charged as to the law applicable to this case. We find, from the perspective of a lay juror uninitiated in the subtleties and carefully-tailored standards of the law, that the instructions are confusing and misleading as to applicable, essential legal principles. Therefore, the jury verdict in this case must be set aside.
Our next step is to review the evidence in this case. After we complete that step, we must decide whether we are able to render a decision on the record in this case or whether we should remand to district court for a new trial.
At the trial of this matter, numerous witnesses testified and many exhibits were entered into the record. We will discuss the evidence as it relates to the issues in this case.
Plaintiff Eugenel Fontenot has been farming in the Ville Platte area for over twenty years. He has two insulated and fully-equipped sweet potato kilns near the city of Ville Platte, in the Belaire Cove area. These kilns are adjacent to his Belaire Cove fields, and near his residence. After plaintiff expanded his sweet potato *149 farming operations to the Pine Prairie area, he leased an old theater in Pine Prairie to use as an additional kiln. He modified the building for use as a potato kiln, but he neither insulated the building nor installed utilities. Shortly before the fire, plaintiff attempted to run a gas line to the building, but he used the wrong type of pipe for butane and he could not get natural gas without permission from the city, because the nearest gas line was across the street from the building, and street excavation was necessary for a hook up.
Plaintiff testified that on the eve of the fire, he was caring for his mother, who had just been released from the hospital. Plaintiff explained that he had to accompany his mother to the bathroom at two-hour intervals, because she could not see. Plaintiff stated that a female companion, Merle Fontenot, was living with him at that time. Merle Fontenot testified that she and plaintiff were at plaintiff's residence the night of the fire, caring for plaintiff's mother. Kenneth Waguespack was the first insurance adjuster to talk to plaintiff. Waguespack recorded plaintiff's initial statement on the morning of the fire. At trial, Waguespack stated that plaintiff had told him plaintiff was at home caring for his mother, but plaintiff did not mention that Merle Fontenot was also at his residence that night.
It should be noted that plaintiff's kiln in Pine Prairie was over ten miles away from his residence. Plaintiff stated that his first knowledge of the fire occurred when he received a phone call at approximately 2 a.m. on December 22, 1982, the morning of the fire. Plaintiff testified that he believes the fire was intentionally set by someone, but he does not know who burned his kiln, or why. Counsel for both sides stipulated that the kiln itself, owned by a third party, was uninsured.
Plaintiff testified that about one year prior to the date his kiln burned, he lost a large tractor on his Pine Prairie property to fire. Plaintiff suspected arson, but no investigation was pursued. Plaintiff collected on the insurance policy that covered this tractor. Two years before the kiln fire, also at Pine Prairie, an old truck belonging to plaintiff burned, but it was uninsured. A bulldozer belonging to another man was intentionally burned on plaintiff's Pine Prairie land several years ago. This bulldozer was being used to clear the property for farming. Plaintiff testified that, opposite the burned bulldozer, someone who he suspected was the arsonist had written on a fuel storage tank, "You are destroying our hunting ground bastard." Floyd Soileau, now Sheriff of Evangeline Parish, was the Deputy Sheriff who investigated that incident. He testified that he made no arrests, but he recalled that the phrase "You destroyed our hunting grounds, you bastard" was written on a fuel tank near the burned bulldozer.
Plaintiff also testified that, in the past, a new pick-up truck he owned burned at his residence, one of his eighteen wheel trucks burned on the highway to Rayne, and one of his small tenant houses burned. The eighteen wheel truck was uninsured for fire loss, but insurance was collected on the new pick-up truck and the tenant house. Plaintiff further testified that he twice recovered insurance proceeds for wind damage to one of his buildings; both claims were entered within a two-month period.
Plaintiff stated that he had suffered several acts of vandalism to some of his property located at Pine Prairie. Plaintiff convinced the Evangeline Parish Sheriff's Department to deputize one of his employees, Oliver Guidry, who resided on the Pine Prairie property, so that Guidry would have legal authority to prevent miscreants from damaging plaintiff's property.
On cross-examination, defense counsel introduced deposition testimony by plaintiff in which plaintiff stated that nobody disliked him enough to burn his potato kiln. Defense counsel elicited testimony from plaintiff that plaintiff owed creditors a total of at least $1,700,000 at the time of the fire. These creditors included Evangeline Bank & Trust, the Small Business Administration, Tide Products (an agricultural chemical company), and the Federal Land *150 Bank. Defense counsel sought to establish on cross-examination that plaintiff's sweet potatoes were not selling in enough quantity and at a high enough price for plaintiff to pay even a small portion of his debts as they came due. Defense counsel also asked plaintiff why his amount of sweet potatoes in the uninsulated Pine Prairie kiln increased just prior to the fire, while the number of potatoes in his top-quality Belaire Cove kilns decreased. Plaintiff explained that the Pine Prairie kiln was the most convenient storage spot for potatoes harvested from his Pine Prairie fields. Further, defense counsel questioned plaintiff about the possibility that plaintiff would have lost all of his potatoes in the Pine Prairie kiln in the period after the fire, in any event. Evidence presented at trial shows that sweet potatoes get "hard core," and become unfit for consumption, if they attain an internal temperature below fifty degrees for any substantial amount of time. The fire occurred just before Christmas, at the beginning of that time of the year when periods of cold weather are most likely to occur. The Pine Prairie shed was admittedly uninsulated and unheated, and not as suitable for protecting potatoes from the elements as a specially built potato kiln. However, plaintiff testified that he could have burned charcoal for heat in the Pine Prairie kiln if the need had materialized. Plaintiff stated that several days of below-freezing weather are needed to bring the internal temperature of sweet potatoes down to a damage-causing level when the potatoes are stored in quantity in a warehouse or kiln. Plaintiff testified that sweet potatoes, like other organic material, produce certain amounts of self-generated heat, and that the Pine Prairie shed contained a large quantity of potatoes. On redirect, plaintiff testified that he never used the heaters in his insulated Belaire Cove kilns during the winter of 1982-83, because the weather did not stay cold enough for a long enough period of time.
Luke Martin, plaintiff's broker for sales of sweet potatoes, testified for plaintiff. Martin stated that he always found buyers for all the sweet potatoes he could sell, and that plaintiff eventually would have sold all of his Pine Prairie potatoes. He stated that plaintiff always had high quality sweet potatoes. Martin added that sweet potato farmers in south and central Louisiana very seldom need heat for their kilns and storage facilities.
Plaintiffs' independent insurance agent, James Vidrine, stated that he procures all of plaintiff's insurance, both personal and business. Vidrine testified that he has been handling the insurance on plaintiff's sweet potato crop since 1962, and plaintiff has never claimed a loss under his coverage for sweet potatoes. The policy on plaintiff's potatoes was an "open" or "reporting" policy, in which plaintiff calculated the amount and value of his potatoes and packing materials each month, and relayed that information to Vidrine so that the proper sum of coverage could be obtained. Of course, plaintiff's monthly premiums varied, depending on the cash amount of coverage. On cross-examination, Vidrine stated that on December 10, 1982 (twelve days before the fire), plaintiff supplemented the count of potatoes for December, 1982, in the Pine Prairie kiln. Plaintiff phoned his insurance agent and told him that the previous total he had given for coverage during the month of December was too low; that he in fact had 14,800 crates of potatoes in the Pine Prairie kiln instead of 9,500. Plaintiff did not change his estimated value of potatoes from the nine dollars per crate figure provided in his original December report. Plaintiff also phoned Vidrine again on December 13 to ask whether his insurance for the Pine Prairie kiln covered empty crates, pallets, and packing materials. Vidrine testified that plaintiff had never before filed a supplemental report on the value of his crop; rather, plaintiff had always simply filed the usual statement at the end of each month. However, it should be noted that, according to the testimony of insurance adjuster James Cagnina, plaintiff's amended potato count was substantially correct.
Plaintiff's employee and deputized watchman over plaintiff's Pine Prairie *151 property, Oliver Guidry, testified that he checked the potato kiln twice each day, once in the morning and then again at about 7:30 p.m. Guidry stated that he saw nothing amiss at the potato kiln on the eve of the fire. Guidry stated that he had the only key to the padlock on the front door of the kiln, and that, to the best of his recollection, the kiln was securely chained and locked on the eve of the fire. Plaintiff also testified that Guidry had the only key to the padlock. Plaintiff's son, Paul Ted Fontenot, testified on deposition that his father had a key to the padlock, but at trial plaintiff's son stated that he did not know whether his father or Guidry (or both) had a key.
Harold Quebedeaux testified that he farms sweet potatoes in Mansura, and that he sold unassembled packing crates to plaintiff. Quebedeaux stated that the cost of the unassembled packing crates, the cost of materials needed for assembly, and labor costs result in an expense of about sixty-five dollars per crate.
Harry Bushnell, Roy Serie, and Roland Thomas are all employees of plaintiff. They testified that the sweet potatoes in the Pine Prairie shed were all number one grade.
Jack Fruge is an attorney in Ville Platte and the president of Evangeline Bank & Trust. He testified that that bank held a crop lien on all of plaintiff's produce. Fruge added, however, that the bank worked with plaintiff on his debt and that the bank would not take all of plaintiff's proceeds from his potato sales even though plaintiff's debt to Evangeline Bank & Trust was large; rather, the bank would always ensure that plaintiff had enough money to continue his farming operations.
Gaynor Soileau, plaintiff's attorney, testified that his law firm had spent over three hundred hours preparing for trial. Plaintiff's attorney explained the contingent fee arrangement entered into between his firm and plaintiff.[1]
Joseph R. Smith, the fire chief in Ville Platte, was a witness for the defense. Smith testified that the night of December 21-22, 1982, was cold, damp, and foggy. Smith's department was called to the fire by Joseph Monier, chief of the Pine Prairie volunteer fire department. Monier testified that he also received assistance from the Turkey Creek and Mansura fire departments. Smith testified that the fire started in the rear of the building, and that it appeared to have started at least partially inside the kiln. Monier, the first official on the scene, stated that there were several separate fires on the walls of the kiln when he arrived. Both Monier and Smith suspected arson, and they contacted the office of the state fire marshall.
Terry D. Campbell lives about one block from the site of the fire. He is a diabetic, and he testified that he was awake the night plaintiff's kiln burned. Campbell recalls hearing tires squeal shortly before he first smelled smoke. He looked out his back door after smelling the smoke and he saw the fire. Campbell immediately contacted the authorities.
Deputy state fire marshall Danzel Marcantel arrived at the scene of the fire at 5:40 a.m. on December 22. He noted the separate points of origin of the fire, and he subsequently determined that the fire had been intentionally set. Neither Marcantel nor any of the other fire officials and insurance investigators found any evidence of forced entry to the kiln. All officials and investigators questioned at trial stated that no padlock or chain was found on the front door of the kiln, nor anywhere else at the fire site. On cross-examination, Marcantel *152 stated that no one was arrested following his investigation of the arson.
Gary Morgan is an experienced arson investigator hired by defendants to determine the cause of the fire, to take samples for tests, and to attempt to find the arsonist, if he confirmed the fire officials' finding that the kiln had been intentionally burned. At trial, Morgan was tendered and accepted as an expert on the determination of the origin and cause of fires. Morgan testified that he reached the fire scene at about 11:30 a.m. on December 23. He stated that he found four points of origin on the outside walls at or near the rear of the kiln. The kiln had a wooden floor in the back of the building, and Morgan found two points of origin on this wooden floor inside of the kiln. He testified that it appeared to him that a flammable liquid had been poured on the floor and the walls at the points of origin, and that flammable liquid had also been poured on some crates inside the building near the rear wall. As previously indicated, Morgan found no padlock or chain and no indication of forced entry. Morgan determined that there were no possible accidental causes of the fire, and this, coupled with positive evidence of arson, led him to state at trial: "This fire was intentionally set by an arsonist with the intention of burning this building to the ground."
Morgan collected debris and soil samples at four of the points of origin. These samples were placed by Morgan in sterile containers furnished by Dr. Andrew T. Armstrong, an experienced chemist and a professor at the University of Texas. Testifying as an expert at trial, Armstrong stated that he ran three types of scientific tests on each sample. Armstrong determined that gasoline was used as an accelerant at two of the tested points of origin. Armstrong could conclusively state only that hydrocarbons indicating the presence of an accelerant were found in the remaining two samples, but, although these samples probably indicated the use of gasoline, it was possible that a related hydrocarbon had been used.
As part of his assignment, Gary Morgan was told to investigate the financial circumstances of plaintiff. One month after the fire, Morgan met with plaintiff to discuss his financial status. Plaintiff would not reveal any information to Morgan; plaintiff told Morgan to contact plaintiff's banker. An officer of Evangeline Bank & Trust would not disclose plaintiff's financial information to Morgan because Morgan did not have a financial disclosure release form executed by plaintiff. However, the bank officer did show Morgan a copy of a publicly recorded mortgage indicating that plaintiff was indebted to the bank. Morgan then checked the Evangeline Parish Courthouse records and determined that plaintiff owed secured debts totalling $2,101,953.
Joseph Cagnina is an adjuster with General Adjustment Bureau Services. Like Gary Morgan, Cagnina is not affiliated with either defendant. (Later testimony by executives of defendants indicates that it is an accepted practice to hire outside investigators and adjusters when coverage for a loss is provided by two or more separate insurers.) Cagnina was tendered and accepted as an expert appraiser of fire losses. Cagnina stated that he accepted plaintiff's count of potatoes and packing materials lost in the fire. He stated that all of plaintiff's property in the Pine Prairie kiln was a total loss. Cagnina had also been asked by defendants to investigate plaintiff's financial circumstances. Cagnina testified that plaintiff would not cooperate with him and that plaintiff refused to execute a financial disclosure release form. Cagnina stated that plaintiff returned defendant insurers' proof of loss forms without filling them out.
James Shipp, Jr., manager of the local Tide Products retail office, testified for the defense. Shipp stated that plaintiff owed Tide Products approximately $150,000 at the time of the fire. Shipp noted that plaintiff had told him in late October of 1982 that plaintiff would be able to begin paying $10,000 per month on his debt in the near future. In November of 1982, Tide Products' credit manager made a special *153 trip to Ville Platte to encourage plaintiff to begin payment on his debt.
William Linn, Jr., testified by deposition that he was the officer of the Small Business Administration (SBA) who was in charge of the SBA's loan to plaintiff. Linn stated that he loaned $165,200 to plaintiff under the SBA's disaster loan program on April 20, 1978. This loan was to be repaid in yearly installments of $19,336 due on March 1 of each year. Plaintiff pledged certain previously encumbered real estate to secure the loan. Plaintiff paid his installments in 1979 and 1980, but, after a poor crop, plaintiff was unable to pay in 1981. Plaintiff applied for an additional disaster loan, which was denied because the SBA did not believe he had the ability to repay an additional loan. The SBA periodically phoned and sent reminder letters to plaintiff regarding his obligation under the 1978 loan, and then on October 13, 1982, the SBA informed plaintiff by letter that it would defer collection on the 1981 installment under the condition that plaintiff post additional security, because liens that primed SBA's security interest on the pledged land exceeded the fair market value of that land. The SBA suggested that plaintiff provide it with a mortgage on certain other land, and the SBA told plaintiff to respond within ten days. Plaintiff did not respond. Linn traveled to Ville Platte to visit plaintiff on October 28, 1982. Plaintiff took Linn on a tour of plaintiff's farming facilities, and plaintiff told Linn he would pay his 1981 installment on January 15, 1983. (Plaintiff failed to make that payment.)
Randy Lafleur is the president and Chief Executive Officer of the office of the Federal Land Bank (FLB) in Opelousas. Lafleur stated that FLB's mission is to provide low interest loans to farmers. Lafleur's bank loaned plaintiff $574,000 on February 27, 1981. The loan was secured by a first mortgage on certain farmland. Lafleur testified that the loan had a variable rate of interest, but that it was scheduled for fifteen yearly installments due March 1 of each year of approximately $78,724.85. Because of a rise in interest rates, plaintiff's first installment, due March 1, 1982, amounted to $81,329.33. Plaintiff did not pay. Two written reminders were mailed to plaintiff, plaintiff was called by telephone on March 15, 1982, and then, two days later, Lafleur personally visited plaintiff. Plaintiff told Lafleur that he had a bad crop year, and Lafleur agreed to reamortize the loan with the first payment due March 1, 1983.
Jimmy Vidrine is executive vice president and a loan officer for Evangeline Bank & Trust. Vidrine testified that plaintiff owed that bank approximately $800,000 in the fall of 1982. Vidrine stated that about $350,000 of that sum was secured by a crop lien.
Frank Cunningham of North Merrick, New Jersey is the executive vice president of the general cover department of defendant Hanover Insurance Company. Edward T. Stroud of Baton Rouge is an officer in the property loss department for defendant Audubon Insurance Company. Cunningham and Stroud had authority over the payment of plaintiff's claim for their respective employers. Stroud testified that after reading adjuster Cagnina's initial report, which indicated arson, he contacted Morgan to investigate the fire. Morgan and Armstrong, the chemist, supplied conclusive information indicating arson. After surveying further information, including the state of the kiln, the problems that plaintiff might have encountered in selling his potatoes to ease his tremendous debt burden, and the possibility of a loss of the potatoes to cold weather, Stroud concluded that plaintiff had a motive to burn the kiln. This apparent motive, coupled with undisputed arson, plaintiff's failure to cooperate, and no evidence to indicate that the arsonist was a third party not working in concert with plaintiff, convinced Stroud that plaintiff had burned his potatoes. Thus, Stroud decided to deny plaintiff's claim. Cunningham's recount of the history of plaintiff's claim did not significantly differ from Stroud's account. Cunningham stated that within two weeks of the loss he had confirmed that the kiln was intentionally *154 burned. Cunningham then focused Hanover's investigative efforts on determining the identity of the arsonist or arsonists. Again, based on all of the circumstances, Cunningham concluded that plaintiff was responsible.
Upon consideration of the above evidence, we are faced with two potential courses to follow: (1) a remand to district court, or (2) a decision reached upon the record. Gonzales v. Xerox Corp., 320 So.2d 163 (La.1975) discusses and reaffirms the constitutional power of an appellate court to decide a case de novo on the record when the jury verdict must be set aside and given no weight because of trial court error. This power is consistent with appellate jurisdiction of both law and facts. 320 So.2d at 165. See also La. Const. art. 5, secs. 5 & 10. Of course, the appellate court must have "all the facts before it," 320 So.2d at 165; i.e., the complete record. Gonzales continues:
"In addition to the constitutional authority, and consistent with it, there is a very practical consideration which encourages our appellate courts to exercise their jurisdiction to review factual findings: judicial economy. When the entire record is before the appellate court, remand for a new trial produces delay of the final outcome and congestion of crowded dockets while adding little to the judicial determination process. Although the appellate court does not gain the benefit of personally viewing the witnesses, it does have a complete record and the constitutional authority to decide.
Substantial deviation from the rule that appellate tribunals with a complete record before them review facts and render decisions has been infrequent."
Id. at 165-66.
Gonzales does not mandate a trial de novo on the record in the appellate court, but instead recognizes such a course of action as an allowable and usually efficient alternative to remand. However, this court has discovered no case subsequent to Gonzales that has been retried in district court after the original verdict has been set aside. See, e.g., Reed v. Gulf Ins. Co., 436 So.2d 580 (La.App. 4th Cir.) (setting verdict aside and remanding to trial court), writ granted, 441 So.2d 752 (La.1983) (vacating remand only and directing court of appeal to decide case on record), on remand, 447 So.2d 1102 (La.App. 4th Cir.1984) (deciding case on record).
One Louisiana Supreme Court case subsequent to Gonzales recognizes that no hard and fast rule requires trial de novo in the appellate court. In Ragas v. Argonaut Southwest Ins. Co., 388 So.2d 707 (La. 1980), the court recognized that, when the jury verdict must be set aside,
"and where the record is otherwise complete, the appellate court should, if it can, render judgment on the record.
This is not to say, and Gonzales should not be read to require, that the appellate court must find its own facts in every such case. There are cases where the weight of the evidence is so nearly equal that a firsthand view of witnesses is essential to a fair resolution of the issues. The appellate court must itself decide whether the record is such that the court can fairly find a preponderance of the evidence from the cold record. Where a view of the witnesses is essential to a fair resolution of conflicting evidence, the case should be remanded for a new trial."
Id. at 708.
In light of the above principles, and the evidence that we previously discussed, we find that we are able to render judgment on the record. We do so in the interest of judicial economy, and we do so only because we are convinced that the burden of proof which rests upon defendants has not been met, under any reasonable evaluation of the credibility of the witnesses and the weight of the evidence.
Virtually all of the circumstances in the evidence that we have discussed can carry dual inferences. For example, the large number of fires experienced by plaintiff could be taken to show that he is prone to burn his property for profit; however, this *155 evidence can also support a finding that plaintiff has often been the target of vandals and arsonists. Plaintiff's financial problems could certainly provide a motive, however, evidence that others might have started the fire, that plaintiff's creditors planned no drastic action, and that plaintiff may have been able to sell his potatoes in any event, tend to counter the inference that plaintiff burned his crop fraudulently because of debt problems. Although plaintiff might have lost his Pine Prairie potatoes to the cold, it is also not unreasonable to find that he would have been able to provide adequate protection from the elements. The missing padlock and chain on the kiln door could have been removed by plaintiff or a confederate to facilitate fraudulent arson; conversely, the lock and chain may have been cut off by unknown arsonists. The litany of possibilities considered by this court will not be totally recapped here. It is sufficient to note that the circumstances point to no conclusion that can be said to be any more reasonable or probable than some contradictory conclusion.
We are not convinced that the covered loss did not result from arson by the plaintiff; we simply hold that defendants have not met their burden of proof. Under the applicable legal standards, we hold that defendant insurers did not prove, by a preponderance of the evidence, that, based on the circumstances surrounding the occurrence of the fire, there is no other reasonable hypothesis but that plaintiff is responsible for the fire. Accordingly, we will enter judgment awarding plaintiff the proceeds to which he is entitled under the insurance policies issued by defendants.
We find that plaintiff is not entitled to penalties and attorney fees under Louisiana Revised Statute 22:658 for the insurers' failure to pay his claim within sixty days. In order to award fees and penalties under that statute, the failure to pay must be "arbitrary, capricious, or without probable cause." The insurers had a rational legal and factual basis to deny coverage in this case; the fire was undeniably of incendiary origin, and the circumstances surrounding the fire raised a considerable question, which was properly presented to a court of law, as to whether plaintiff was responsible for the fire. See McGrew v. State Farm Mut. Auto. Ins. Co., 385 So.2d 1276, 1284 (La.App. 3d Cir.1980); Wallace v. State Farm Fire & Cas. Ins. Co., 345 So.2d 1004, 1009 (La.App. 2d Cir.), writ denied, 349 So.2d 334 (La.1977). Plaintiff's claim for penalties and attorney fees is denied.[2]
Because we are the fact-finders in this trial upon the record, we must set the damages in this case. We find the testimony of adjuster Joseph Cagnina to be accurate and credible as to the value and amount of plaintiff's lost sweet potatoes and packing materials. We find that all potatoes and packing materials are a total loss. We set the amount of plaintiff's recovery for this lost property at $124,173.50, which represents the actual cash value of that property. We find that plaintiff cannot recover debris removal and clean-up costs. Under both policies of insurance, debris removal and clean-up costs are not payable to the extent that such payments would result in the insurers paying on a covered loss an amount greater than one hundred percent of the actual cash value for all covered property. Here, the insurers must pay one hundred percent of actual cash value for all covered property, because the fire resulted in a total loss of plaintiff's covered property. Thus, no debris *156 removal and clean-up costs are payable under the terms of the policies.

DECREE
It is ordered, adjudged, and decreed that the district court's judgment in this case be set aside; judgment is now entered herein in favor of plaintiff Eugenel B. Fontenot, and against defendants Hanover Insurance Company and Audubon Insurance Company, in the amount of $124,173.50, with legal interest from date of judicial demand. All costs are taxed to defendants Hanover Insurance Company and Audubon Insurance Company.
VERDICT SET ASIDE; JUDGMENT RENDERED FOR PLAINTIFF.
YELVERTON, J., concurs with reasons.
YELVERTON, Judge, concurring.
I concur only to express my disagreement with describing our appellate function in this case as a trial de novo. Otherwise, I fully agree with the opinion.
NOTES
[1] One facet of plaintiff's claim is reasonable attorney fees for the insurers' alleged arbitrary and capricious denial of plaintiff's demand for payment of insurance proceeds. See La.Rev. Stat. 22:658. Although an attorney for a party to a lawsuit generally cannot testify in that lawsuit without violating the disciplinary rules of the Louisiana Bar Association, it is proper for an attorney to testify "[i]f the testimony will relate solely to the nature and value of legal services rendered in the case by the lawyer or his firm to the client." Code of Professional Responsibility DR 5-101(B)(3) (La. State Bar Ass'n Att'y's Desk Book 1980).
[2] The jury's finding as to penalties and attorney fees is necessarily eliminated because the verdict is set aside as a result of instructional error as to defendants' burden of proof. However, the instructional basis for the jury's award of penalties and fees is noteworthy. The trial judge instructed the jury that the question of whether the insurers had acted arbitrarily, capriciously, or without probable cause turned on "whether there was a bona fide factual dispute as to the occurrence of the fire." No further relevant guidance was provided; thus, understandably, the jury found for plaintiff on the penalties and fees issue.