473 So.2d 120 (1985)
Sharon HEBERT, Plaintiff-Appellant,
v.
Elia DOMINGUE and Lumbermen's Mutual Casualty Company, Defendants-Appellees.
No. 84-561.
Court of Appeal of Louisiana, Third Circuit.
June 26, 1985.
Rehearing Denied August 6, 1985.
*121 Gary Steckler by Steve Santillo, Lafayette, for plaintiff-appellant.
Roy and Hattan, L. Lane Roy, Lafayette, for defendants-appellees.
Before FORET, LABORDE and YELVERTON, JJ.
LABORDE, Judge.
This personal injury suit was tried before a jury in the Fifteenth Judicial District Court for the Parish of Lafayette. The jury found that the negligence of defendant Elia Domingue was a legal cause of the accident and that the degree of her negligence was in the amount of 70%. The jury further found that plaintiff Sharon Hebert was also negligent and apportioned the degree of her negligence at 30%. The jury found plaintiff's damages totalled $18,700.00. Thereafter, the trial judge signed a judgment reducing the award to plaintiff by 30%, resulting in a total award of $13,090.00. Plaintiff filed a petition for appeal alleging three errors. We amend and, as amended, we affirm.

FACTS
An automobile accident between plaintiff and defendant occurred at about 6:00 p.m. on February 1, 1982. The point of the accident was on U.S. Highway 167, the Lafayette to Abbeville highway, just south of its intersection with La. Highway 733.
Plaintiff Sharon Hebert and her three children were traveling on Highway 167 South, toward Abbeville, in a Toyota Stationwagon. Defendant Elia Domingue was driving a Chevrolet Monte Carlo in the opposite direction on Highway 167 North, toward Lafayette.
Some of Ms. Domingue's children own homes along Highway 167 in the area just south of Highway 733. At the time of the accident, she had just left her son's home and was heading toward the home of her daughter, just about 400 to 500 feet away. Ms. Domingue left the driveway of her son's home. She turned north on Highway 167 toward her daughter's home. She was followed by her granddaughter, Carolyn Scott. After Ms. Domingue pulled onto the highway, Ms. Scott yielded to an oncoming vehicle, then she also pulled onto the highway *122 and proceeded in the same direction as both Ms. Domingue and the vehicle she yielded to. Ms. Domingue drove her car several hundred feet down the highway and then began to search for her daughter's driveway.
Being February, it was dark at 6:00 p.m. and this area of Highway 167 had no artificial street lighting of any kind. Ms. Domingue admitted at trial that it was very difficult to locate her daughter's driveway. At the time of the accident, ditches lined both sides of Highway 167 and there was nothing (such as reflectors) to indicate the location of the driveway. Therefore, Ms. Domingue had to be very attentive in her search for the driveway.
Before entering the driveway, Ms. Domingue came to a complete stop. Her testimony was as follows:
"Q. Okay. So, you said you stopped and you made a left turn and there was nothing in front of you to obstruct your vision?
A. No.
Q. When you hit that car, where were you looking?
A. I was looking for the driveway and when I curved, I hit her on the shoulder of the road ...
....
Q. So, as you were turning, you were looking into the driveway?
A. Yes, I was watching to turn into the driveway.
Q. So, that's where your eyes were, at the driveway?
A. Yes."
To her surprise, she collided with something on the shoulder of the highway. It was Ms. Hebert's car.
Ms. Hebert, traveling south on Highway 167, saw Ms. Domingue's car come across the centerline. Ms. Hebert, veered onto the shoulder to avoid a collision. Then, just as Ms. Hebert was to pass Ms. Domingue, Ms. Domingue turned into Ms. Hebert. The resulting collision forced Ms. Hebert's car off the road and into the ditch adjacent to the shoulder of the southbound lane of the highway.
Subsequently, Ms. Hebert filed the suit which gave rise to this appeal. She alleged that the collision was caused solely by the negligent acts of Ms. Domingue. Ms. Domingue, in the answer, denied plaintiff's allegations and further alleged that Ms. Hebert was comparatively negligent for operating her, Ms. Hebert's, vehicle at night without the use of headlights.
After the trial, the jury found that both Ms. Domingue and Ms. Hebert was negligent. The degree of negligence was apportioned 70% to Ms. Domingue and 30% to Ms. Hebert.
Ms. Hebert subsequently filed motions for Judgment Notwithstanding the Verdict, New Trial, and, alternatively, Additur; all of which were denied by the trial judge. Then Ms. Hebert filed this appeal alleging the following assignments of error:
1) That the jury's verdict on the issue of liability, in which they found the plaintiff to be negligent in the amount of 30%, is "manifestly erroneous" and clearly contrary to the facts and law presented herein, in that said facts can only support the conclusion that the negligence of the defendant-driver was the sole legal cause of this collision, and the damages suffered by the plaintiff as a result thereof.
2) That counsel for the defendant made several improper remarks during his closing argument which were inflammatory and unsupported by the evidence, and said remarks had a prejudicial effect on the appellant's ability to recover adequate compensatory damages.
3) That the jury committed an abuse of discretion on the issue of the quantum of damages by making an award to the plaintiff in the amount of $18,700.00, said verdict on quantum being inadequate compensation for the damages suffered by the plaintiff, said damages having been proved by a preponderance of the evidence presented to the jury.

*123 NEGLIGENCE
Ms. Hebert contends that there is no reasonable evidentiary basis for the jury's findings of fact which caused them to declare that her "negligence" was a 30% cause of the accident.
Ms. Hebert asserts that the jury based her negligence on their conclusion that she was driving at night without having turned on her headlights. Although the jury did not state the basis for which it found Ms. Hebert 30% negligent, we find that the only basis supported by the record upon which the jury could have reasonably concluded that Ms. Hebert was negligent involved the question of whether, at the time of the accident, Ms. Hebert was driving her car without the headlights being on.
Ms. Domingue's testimony concerning the issue of the headlights was as follows:
"Q. You made a left turn into Mrs. Hebert?
A. Yes.
Q. And you hit her somewhere near the shoulder of the road on the other side?
A. I hit herwhen I turned, the corner of my car hit herhit something on the shoulder of the road. I didn't know what it was. There wasn'tI didn't see no lights, nothing. I didn't know what it was.
Q. Okay, but you don't know if she had her lights on or off at that time?
A. Well, at that time, I don't think she had her lights. I would have seen the lights.
Q. Okay. Are you saying that she did not have her lights on?
A. No, she did not have no lights.
Q. You're saying she did not have her lights on?
A. When I knockedwhen I hit the car, there was no lights.
Q. Okay. Did you see the car when you hit the car?
A. No. I didn't know what I had hit.
Q. When did you first see the car?
A. When I bumped something, I opened the door to see, and when I opened my door, I saw the car was just drove in the ditch.
....
Q. So, then, you do not know from your own knowledge, do you, whether she had her lights on or off at the time you hit her?
A. Well, at the time I hit her, I didn't see no lights at all. I didn't know what I had hit, but when I saw the car, there was no lights on the car.
Q. And the first time was when she was in the ditch?
A. Yes.
Q. Okay. So, my question to you is that you do not know, sitting here today in Court, whether her lights were on or off at the time of the accident, do you? You can't swear to it?
A. No."
We conclude from the record that Ms. Domingue stopped, looked for oncoming vehicles, saw none, and then looked toward the driveway as she proceeded to make her turn. On the question of whether Ms. Hebert's headlights were on, Ms. Domingue's testimony was supported by two other witnesses; particularly, the testimony of her granddaughter, Carolyn Scott. Ms. Scott testified that after she heard a crash, she looked, a split second later, at the Toyota in the ditch and the headlights were not on. It is important to note that neither Ms. Domingue nor Ms. Scott could state that, at the time of the collision, Ms. Hebert's headlights were not on. Turney Simon was Ms. Domingue's other witness. He is the owner of the driveway in which the accident occurred and he is Ms. Domingue's son-in-law. The most important testimony given by Mr. Simon was his uncontradicted statement that three to four months after the accident, Ms. Hebert visited him to ask if he might have turned off the lights to her car that night.
On the other hand, Ms. Hebert testified that her headlights were on throughout the *124 entire episode and that she turned them off after the collision. Ms. Hebert's testimony included the following:
"Q. What did you do at the time of the accident?
A. Well, I couldn't get away from her, so when I ended up in the ditch, I turned everything off, and then, reached for my children. At one point, I tried to open the door and I couldn't get that door open. I turned back to the kids, and then, Mrs. Domingue pulled the door open. I screamed at ther [sic], and then, I went back to the children.
....
Q. Describe the lighting. Could you see in the vicinity of the accident?
A. I could see what I saw through my headlights.
Q. Were they on?
A. They were on.
Q. You're sure about that?
A. I'm positive they were on. You don't drive from that part of town to that end of town without your lights on. You can't see anything.
Q. It was nighttime, you said?
A. Yes.
Q. Are you absolutely certain your headlights were on?
A. I'm absolutely certain my lights were on."
Her testimony was supported by the testimony of Rebecca Stevenson, an uninterested third party. On the night of the accident, Ms. Stevenson was driving southbound on Highway 167. For some distance, she had been traveling about 4 to 5 car lengths behind Ms. Hebert. Ms. Stevenson testified that as she followed Ms. Hebert around curves in the road, she saw Ms. Hebert's headlights shining on the road. However, as with the other witnesses, Ms. Stevenson could not say whether, at the time of the collision, Ms. Hebert's headlights were either on or off.
As stated above, the jury's verdict does not state on what basis of fact it found Ms. Hebert negligent. We do not know if its verdict is based either on credibility of the witnesses or on weight of the evidence. However, we do know the jury found Ms. Hebert negligent and, therefore, we shall not reverse unless its findings are clearly wrong. This court shall examine the record and review the facts to determine whether there is any reasonable evidentiary basis for the decision by the jury. Wiley v. Travelers Ins. Co. 300 So.2d 555, 558 (La.App. 3rd Cir.) writ denied, 303 So.2d 187 (La.1978).
Ms. Hebert testified that, before the collision, her headlights were on and that, after the collision, she "turned everything off" (impliedly including her headlights) before reaching for her children, their ages at the time of the accident being one, three, and five. Perhaps the jury did not believe that a mother, after her car has been forced off of a highway and into a ditch, would calmly turn off the engine, the lights and "everything" else before reaching for her infant children. Perhaps the jury found that Ms. Hebert fabricated the story that she "turned everything off" in light of uncontradicted testimony that first, her headlights were off when a witness looked at her car immediately after hearing the collision and, second, that she returned months later to the scene of the accident to ask Mr. Simon if he might have turned off the headlights to her car that eventful night. Whatever the reason, there is a reasonable evidentiary basis upon which the jury could have questioned the credibility of plaintiff and her witnesses, Holmes v. Southeastern Fidelity Ins. Co., 422 So.2d 1200, 1203-04 (La.App. 1st cir.1982) writ denied, 429 So.2d 133 (La.1983), and, therefore, given more weight to the circumstantial and negative testimony of defendant and her witnesses.
We readily admit that a most reasonable conclusion to be drawn from the record is that Ms. Hebert's headlights were on at the time of the accident. However, we are of the opinion that the record taken as a whole fails to point so strongly and overwhelmingly in favor of Ms. Hebert *125 that reasonable and fair minded men could not conclude that her headlights were off at the time of the accident. We shall not disturb reasonable evaluations of fact made by a jury, even though we may feel that our own determinations are more reasonable. Canter v. Koehring Company, 283 So.2d 716, 724 (La.1973). This decision is based upon proper allocation of trial and appellate functions between the respective courts and upon the jury's ability to better evaluate live witnesses. Id.
We also note that plaintiff filed a Motion for Judgment Notwithstanding the Verdict and a Motion for New Trial. Accordingly, the trial judge made an independent review of the jury's verdict. The trial judge is more able to determine the reasonableness of the jury's decision because he is present during the presentation of testimony. He found no defect in the verdict. Considering the great deference given to a trier of fact on factual determinations and the fact that the trial judge found no error, we hold that the jury's verdict on the issue of liability is not manifestly erroneous.

DEFENDANT'S CLOSING ARGUMENT
Appellant contends that counsel for defendant made several improper remarks during his closing argument which were unsupported by the evidence and which had a prejudicial effect on appellant's ability to recover adequate compensation.
During closing arguments, counsel for defendant made several statements to the jury concerning appellee's ability to pay any judgment which might be rendered against her. The objectionable actions were those by counsel for defendant in declaring that Ms. Domingue, being 76 years old, would be unable to either find work or obtain financing to pay any judgment in excess of her insurance coverage. These remarks had no evidentiary support in the record and, therefore, were improper. E.g., Barrere v. Commercial Union Ins. Group 195 So.2d 461, 463 (La.App. 4th Cir.1967). However, we believe that corrective measures taken by the trial judge and counsel for plaintiff served to counteract any prejudicial effect the closing argument by counsel for defendant may have had upon the jury. See, e.g., Williams v.Sentry Ins. Co., 370 So.2d 901, 903 (La. App. 1st Cir.) writ refused, 372 So.2d 1055 (La.1979); Temple v. Liberty Mutual Ins. Co., 330 So.2d 891, 894 (La.1976).
The argument by defendant's counsel concerning her ability to find work and to obtain financing was promptly objected to by counsel for plaintiff. At that point the trial judge reminded the jury that "what the attorneys say is not evidence." During rebuttal argument, plaintiff's counsel emphasized that the "things about borrowing money" was not in evidence and that the judge stopped counsel for defendant from discussing them. Again during the trial judge's charge to the jury, the trial judge stated that the jury "must deliberate this case without regard to sympathy, prejudice, or passion" and that "[n]either the written pleading, nor the arguments made by the lawyers ... is evidence." The above, along with the record taken as a whole, convinces us that the jury was not unduly influenced by the improper remarks by appellee's counsel.

DAMAGES
Plaintiff claims that the jury abused its discretion on the issue of quantum of damages by awarding $18,700.00.
"Before a trial court award can be questioned as inadequate or excessive, a reviewing court must look first not to prior awards, but to individual circumstances of the present case. Only after analysis of the facts and circumstances peculiar to an individual case or plaintiff may a reviewing court determine that the award is [either] excessive [or inadequate]. Thus, the initial inquiry must always be directed at whether the fact-finder clearly abused their [sic] much discretion."
Darbonne v. Safeco Ins. Co. of America 452 So.2d 801, 804 (La.App. 3rd Cir.1984) (citations omitted). In this case, defendant presented two arguments that might have *126 affected the jury award. First, defendant questioned whether the accident was the sole cause of plaintiff's injuries. Second, defendant urged the jury to consider evidence of her inability to pay in determining the amount of the award.
The collision between Ms. Hebert and Ms. Domingue caused Ms. Hebert to hit her head against the ceiling of her car just above the driver's side window. Every medical diagnosis introduced at trial found objective indications that Ms. Hebert had muscle spasms both in the posterior area of her neck and between her shoulder blades. The jury faced a claim by defendant that the severity of plaintiff's muscle spasms and resulting pain was related more to her psychological problems than to her injuries from the accident. The determinative issue is whether the accident was the legal cause of plaintiff's muscle spasms.
Defendant presented one expert witness to rebut the damage claims of plaintiff. The expert witness, a clinical psychologist and not a medical doctor, testified that, as a result of the accident, Ms. Hebert did have some minor physical injury to her neck. However, in his opinion, her tendencies to convert psychological problems into physical complaints caused a minor injury to grow into severe muscle spasms.
Defendant's expert witness explained further that four months before the accident Ms. Hebert was involved in a very stressful divorce. The divorce resulted in her being left with three children to support. This placed a difficult and heavy financial burden on her. Because of the divorce, he felt that she had a lot of stress, anger, and hostility bottled up inside. The accident also added, but only slightly, to her psychological stress. In his opinion, a minor strain, caused by the accident, grew into severe muscle spasms because Ms. Hebert was releasing her tension, mostly from the divorce and only partially from the accident, through her neck injury. He also stated that as time passed and doctor after doctor could not relieve her pain, her frustration added to the tension causing the muscle spasms.
The pain eventually forced Ms. Hebert to quit her job. This caused just concern over how she would support her children. Also, after months of unsuccessful physiotherapy, a neurologist performed a myelogram (a medical test to determine spinal problems) upon her which suggested that Ms. Hebert has a ruptured disc and that this disc is applying pressure on the nerve that controls her muscles and pain sensations in her neck and shoulders. The resulting recommendation for surgery by several doctors caused Ms. Hebert to agonize over whether she should have the somewhat risky operation. Defendant's expert witness claimed that tension from these problems also added to the severity of her muscle spasms.
Defendant's expert witness contends that Ms. Hebert had only a slight physical injury and that the emotional trauma of the accident was merely an aggravating factor of Ms. Hebert's muscle spasms. His reasoning is that the muscle spasms are a direct result of a need to release psychological tension. In his opinion, the major cause of that tension is Ms. Hebert's divorce and the accident is only a minor cause.
Even if we ignore all the medical testimony showing evidence of a ruptured disc and depend solely on defendant's expert witness we find that a reasonable trier of fact could only conclude that but for the accident plaintiff would not have suffered from the muscle spasms. The record shows that Ms. Hebert had no muscle spasms before the date of the accident. The expert witness' testimony suggests that the stress from Ms. Hebert's divorce might cause some future ailment but, without the injury from the accident, there is no indication as to what the ailment might be or when it would occur. He would not say that Ms. Hebert's pain was not caused by the accident. In fact, he stated that the accident is what triggered the muscle spasms.
It is a well settled rule of law that a tort-feasor takes his victim as he finds him and that he is responsible in damages for consequences of his tort, although the *127 damages so caused are greater because of a prior condition of the victim which is aggravated by the tort. Reck v. Stevens, 373 So.2d 498, 502 (La.1979); Williams v. Reinhart 155 So.2d 51, 52 (La.App. 1st Cir.1963); Behan v. John B. Honor Co., 143 La. 348, 78 So. 589, 590 (1917). Based on the record as a whole, we find that the neck injury caused by the accident might be more severe because of a pre-existing and dormant psychological condition, but the tort-feasor is nevertheless responsible in damages for all the consequences of the tort.
The second issue raised by defendant is her inability to pay. This court shall determine the adequacy of the jury award for $18,700.00 without considering evidence of defendant's inability to pay. A recent Louisiana Supreme Court decision has abolished the "inability to pay" doctrine. Rodriguez v. Traylor, 468 So.2d 1186, 1188 (La.1984). It declared:
"[E]ach litigant should stand equal in the eyes of the law regardless of his financial standing. When the inability to pay rule originated in this State there were no bankruptcy laws in effect and a defendant was subject to losing virtually everything he owned. While the policy behind the inability to pay rule, to prevent the bankruptcy of a defendant, is still a valid concern, with todays [sic] modern bankruptcy courts and extensive protections to defendants by virtue of the bankruptcy laws, we feel that this is a more proper consideration for bankruptcy courts and experienced bankruptcy judges rather than a jury which has no expertise in the modern day protections for those who are forced to declare bankruptcy. See La.R.S. 13:3881. We therefore conclude that the trial court should not have permitted the jury to hear evidence of the defendant's inability to pay."
Id.
Now, we shall determine whether $18,700.00 is adequate compensation for plaintiff's injuries. When contemplating a general damage award it is important to note that:
"no two cases are ever fully alike and whether two cases are so similar as to produce like quantum judgments is hardly discernible by gleaning the facts of the comparable decision from simply a written opinion of an appellate tribunal. Thus each personal injury must be evaluated according to its own peculiar facts and circumstances."
Alexander v. Leger, 423 So.2d 731, 735 (La.App. 3rd Cir.1982) (citations omitted).
In the present case, plaintiff's injuries involve muscle spasms in her neck and shoulders. The injury is not so severe that plaintiff is unable to live a relatively normal life but, it is severe enough to require her to limit her activity. Being a typist, she was forced to quit because the posture required to type caused her pain to increase. However, with only slight difficulty, she is still able to care for her infant children and to do, on a limited basis, daily chores around the house. Some of her activities include playing non-physical games with her children, bathing her children, washing dishes, washing windows, vacuuming, doing the laundry, and stripping the beds. It is important to note that each of these activities is done by plaintiff at a slow and deliberate pace and that an interval of rest will often follow. At the time of the trial, plaintiff's condition had lasted for twenty-one months. However, there is evidence that, if plaintiff would choose to follow the recommendations by either her experts or defendant's expert, her pain could be relieved in as little as three months. Under the facts peculiar to this case, we consider that the lowest reasonable award for general damages (past and future pain and suffering) is the sum of $25,000.00.
Upon our review of the record, we find that plaintiff's special damages add up to $38,150.10.[1] Therefore, we conclude *128 that the lowest reasonable amount of plaintiff's total damages equals $63,150.10. Accordingly, we hold that the jury award of $18,700.00 is inadequate.
We recognize that a trier of fact is given much discretion in its award for damages. We also note that the plaintiff filed a motion for additur which was denied by the trial judge. However, despite the great deference given the trier of fact and the fact that the trial judge found no error, we find that, based on the record taken as a whole, the award is clearly insufficient to compensate this plaintiff adequately for her injuries. Therefore, the jury's award for damages is amended and increased to $63,150.10. This award is reduced by 30% (representing plaintiff's comparative negligence) to a total of $44,205.07.

DECREE
For the reasons stated above, we affirm the jury's verdict on the issue of liability and we amend the jury's verdict on the issue of damages. The following decision is rendered: IT IS ORDERED, ADJUDGED, AND DECREED, that judgment is rendered in favor of plaintiff SHARON HEBERT and against defendants ELIA DOMINGUE AND LUMBERMAN'S MUTUAL CASUALTY COMPANY in the amount of SIXTY-THREE THOUSAND, ONE HUNDRED AND FIFTY AND 10/100 ($63,150.10) DOLLARS, the award to be reduced by THIRTY (30%) PERCENT for a total award of FORTY-FOUR THOUSAND, TWO HUNDRED AND FIVE AND 07/100 ($44,205.07) DOLLARS; liability of defendant LUMBERMAN'S MUTUAL CASUALTY COMPANY is confined to its insurance policy limits. All costs of this appeal are charged to defendants.
AMENDED AND, AS AMENDED, AFFIRMED.
YELVERTON, J., concurs in part and dissents in part, and assigns reason.
YELVERTON, Judge, concurring and dissenting.
When a judgment of quantum reflects a consideration of the defendant's inability to pay, the court of appeal should set aside that judgment and redetermine damages, excluding evidence of inability to pay. Rodriguez v. Traylor, cited in the main opinion. This is not the same standard of review as that which we would apply had we found the jury's award was so low as to have been an abuse of its discretion. In that event, we would increase the award to the lowest reasonable amount. There is no such restriction on our authority to make an award in a case where, as here, we are setting aside the jury's award and making a redetermination of damages. Our approach to deciding damages in this case should be no different from that employed by this very panel in another case being decided this date, Fontenot v. Hanover Insurance Company, 473 So.2d 145 (La. App. 3rd Cir.1985), where we found that the jury award was based on inadequate instructions, and we simply started all over and made an award of damages in the light of the applicable law.
Applying the proper standard, I would make an award of general damages of $50,000.00. I disagree with the decision to award the "lowest reasonable amount" of $25,000.00. Otherwise, I agree with the opinion.
NOTES
[1] The following is a calculation of the lowest reasonable amount of plaintiff's special damages:

past medical expenses ................ $ 5,150.10
future medical expenses .............. 8,800.00
past wages ........................... 20,900.00
 ($1,100.00 for 19 mths)
future wages ......................... 3,300.00
 __________
 ($1,100.00 for 3 mths)
TOTAL ................................ $38,150.10