STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

BETTY VAUGHN, ET AL.

VERSUS

PROGRESSIVE SECURITY INSURANCE COMPANY, ET AL.

************

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT,
PARISH OF LAFAYETTE, NO. 2000-3372,
HONORABLE HERMAN C. CLAUSE, DISTRICT JUDGE

************

MICHAEL G. SULLIVAN
JUDGE

************

Court composed of Michael G. Sullivan, Glenn B. Gremillion, and J. David Painter, Judges.

AFFIRMED.

André F. Toce
The Toce Firm
Post Office Box 2716
Lafayette, Louisiana 70502-2716
(337) 233-6818
Counsel for Plaintiff/Appellant:
    Betty D. Vaughn

Tracy P. Curtis
Perret Doise, APLC
Post Office Drawer 3408
Lafayette, Louisiana 70502-3408
(337) 262-9000
Counsel for Defendant/Appellee:
    Progressive Security Insurance Company
    Richard G. Fontenot
    Richard Ross Fontenot

**Adras Paul LaBorde Endom**
**Attorney at Law**
**5157 Bluebonnet Blvd.**
**Baton Rouge, Louisiana  70809**
**(225) 293-8787**
**Counsel for Plaintiff/Appellant:**
**Betty D. Vaughn**

**W. Corey Grimley**
**Gibson-Gruenert, LLP**
**Post Office Box 3663**
**Lafayette, Louisiana  70502-3663**
**(337) 233-9600**
**Counsel for Plaintiff/Appellant:**
**Betty D. Vaughn**

SULLIVAN, Judge.

This is a suit for damages sustained by Betty Vaughn and her son, Johnathan, when the vehicle Betty was driving was rear-ended by a vehicle driven by Ross Fontenot. Betty and the Defendants appeal the judgment of the trial court. For the following reasons, we affirm.

### *Facts*

On June 25, 1999, Betty was driving a 1990 Chevrolet Blazer on La. Hwy. 339 in Lafayette Parish. Her fourteen-year-old son, Johnathan, was seated in the front passenger seat. The accident occurred when Betty was stopped at the intersection of La. Hwy. 339 and Vincent Road, waiting to turn left onto Vincent Road. Ross failed to stop for the Blazer, which was stopped on the roadway in front of him, and his vehicle collided with the Blazer. The force of the impact was described as moderate to severe. Ross testified that he thought he was traveling between forty and fifty miles per hour when the collision occurred. Betty and Johnathan testified that Ross told them, as he approached them after the accident, that he intended to put his foot on the brake but put it on the accelerator instead. Ross's vehicle pushed the Blazer several feet into a ditch. The seats in which Betty and Johnathan were seated broke as a result of the impact. The Blazer and the vehicle driven by Ross were both declared a total loss.

Betty and Johnathan were taken by ambulance to University Medical Center where they received emergency treatment. Each was released and told to report to an orthopedist if they did not improve within a few days of the accident. Thereafter, they sought medical treatment from different physicians beginning with Dr. Louis Blanda, an orthopedic surgeon, Dr. James Pearce, a dentist, Dr. Keith Mack, a family physician, Dr. Allen Johnston, an orthopedic surgeon, Dr. Robert Hodges, a pain

management specialist, and Dr. Harold Urschell, a thoracic surgeon. Betty also saw Dr. R. C. Llewelynn, a neurologist, on one occasion.

Betty sued Ross's father,[1] Richard Fontenot, and his insurer, Progressive Automobile Insurance Company, to recover the damages she and Johnathan suffered as a result of the accident. Liability for the accident was stipulated, but the exact nature and extent of the injuries caused by the accident were hotly contested during the jury trial held December 9-16, 2002. At the conclusion of the trial, the jury rendered a verdict in favor of Betty and Johnathan.

Betty appealed the jury's verdict. She assigns thirteen errors for this court to review. We address only those errors and/or issues which have been argued in her appellate brief and have consolidated the discussion of issues which are related. Betty complains that the jury's verdict was tainted by actions of the Defendants and that the jury's damage awards are inadequate. The Defendants answered the appeal, and assign three errors, none of which were briefed. Assigned errors that are not briefed are deemed abandoned and are not addressed herein. Uniform Rules—Courts of Appeal, Rule 2-12.4.

### Motion to Strike

The Defendants also filed a motion to strike Betty's brief which was referred to the merits. They argue that Betty's brief should be stricken because it exceeds the page limitations in Rule 2-12.2 of the Uniform Rules—Courts of Appeal, which provides that original briefs on 8 ½" x 14" paper should not exceed twenty-eight pages; Betty's brief is thirty-eight pages. Rule 2-12.2 further provides that a motion to file a brief which exceeds this limitation "will be granted for extraordinary and

---

[1]Mr. Fontenot was the proper party defendant, as Ross was a minor when the accident occurred.

compelling reasons." Due to the length of the trial herein and the nature of the assigned errors, we believe that a motion to exceed this limitation would have been granted. In light of this and in the interest of justice, we deny the motion to strike. However, we do admonish counsel that, in the future, he is to file a motion and obtain an order approving a brief which exceeds the page limitations before filing the brief with this court.

### Standards of Review

Betty urges that the trial court committed numerous errors in its rulings on evidentiary matters which require this court to conduct a *de novo* review of the case and render a new judgment. The standard of review for evidentiary rulings of a trial court is abuse of discretion. *Johnson v. First Nat'l Bank of Shreveport*, 00-870 (La.App. 3 Cir. 6/20/01), 792 So.2d 33, *writs denied*, 01-2770, 01-2783 (La. 1/4/02), 805 So.2d 212, 213. If a trial court has committed error in its evidentiary rulings such that the jury verdict is tainted by the errors, the appellate court should conduct a *de novo* review. *Evans v. Lungrin*, 97-541, 97-577 (La. 2/6/98), 708 So.2d 731; *McLean v. Hunter*, 495 So.2d 1298 (La.1986).

In *Evans*, the supreme court stated: "Legal errors are prejudicial when they materially affect the outcome and deprive a party of substantial rights." *Evans,* 708 So.2d at 735. Under *Evans*, a *de novo* review should not be undertaken for every evidentiary exclusion error but should be limited to "consequential errors," which are errors that "prejudiced or tainted the verdict rendered." *Wingfield v. State ex. rel. Dep't of Transp. and Dev.*, 01-2668, 01-2669, p. 15 (La.App. 1 Cir. 11/8/02), 835 So.2d 785, 799, *writs denied*, 03-313, 03-339, 03-349 (La. 5/30/03), 845 So.2d 1059, 1060, *cert. denied*, 540 U.S. 950, 124 S.Ct. 419 (2003).

If we determine that a *de novo* review is not required here, we must review the jury's findings under the manifest error/clearly wrong standard of review which provides that a court of appeal may not set aside a jury's finding of fact in the absence of "manifest error" or unless it is "clearly wrong." *Rosell v. ESCO*, 549 So.2d 840, 844 (La.1989). To reverse a jury's finding, we must find from the record that a reasonable factual basis does not exist for the finding and, further, that the finding is clearly wrong. *Id.*

## Discussion

### Evidentiary Rulings

Betty identified and argued the following evidentiary rulings by the trial court which she contends were erroneous and tainted the jury's verdict.

#### Insurance Memorandum

Betty first argues that the trial court committed error when it allowed the Defendants to introduce a memorandum directed to an employee in Dr. Mack's office by an employee of her attorney's office. The memorandum states in part:

> This was a very bad accident and they are both still hurt. At first we thought this was going to be a 10/20/10 policy; however, the adjuster more or less let us know that it was bigger than that, although we really don't know exactly how much at this time. A.P. seems to think it is a big policy.
>
> We want to see if therapy is going to help them so they need that for sure. I told Betty once she start[ed] seeing Dr. Mack, we want a second opinion on the orthopaedic eval (and treatment). So, please review the records that I have sent along with our Letter of Guarantee.
>
> Let us know what Dr. Mack or Dr. Johnston recommend and we will take care of these guys. I know they will be happy with their new doctors.

The trial court ruled that, because the memorandum was contained in the records of one of Betty's treating physicians, it was admissible pursuant to La.R.S.

4

13:3714. Betty contends that the trial court erred in allowing the memorandum to be admitted into evidence for a number of reasons: 1) it is not a medical record; 2) it is inadmissible as hearsay; 3) it contains collateral source information that the parties agreed to redact and was prohibited by the trial court's orders; and 4) the reference in the memorandum to insurance limits is prohibited by La.Code Evid. art. 411.

The memorandum was not prepared by Dr. Mack, Dr. Johnston, or anyone on their staff and it does not address any medical treatment provided to Betty or Johnathan by Dr. Mack, Dr. Johnston, or any other medical provider. The Defendants' only purpose in introducing the memorandum was to suggest to the jury that Betty and Johnathan were not injured as severely as they claimed and that their attorneys "orchestrated" their medical treatment to increase the amount of their recovery.

Louisiana Revised Statute 13:3714 provides for the introduction of medical records when the records have been certified in accordance with the statute by the medical provider. This statute is an exception to the hearsay rule "with respect to those who made the medical record, i.e., the physicians, nurses, and technicians." *Holmes v. Caesar*, 528 So.2d 1391, 1392 (La.App. 4 Cir. 1988). Its purpose is to "save a litigant the difficulty and expense of producing as a witness each person who assisted in the treatment of the patient." *Id.* In *Kenney v. Cooper*, 444 So.2d 211, 212 (La.App. 1 Cir. 1983), the court determined that, because La.R.S. 13:3714 is an exception to the hearsay rule, "hearsay and irrelevancy, are independent bases for exclusion of evidence."

There is no question that the memorandum is hearsay. No evidence was presented and no argument was made that any hearsay exception, other than La.R.S.

5

13:3714, is applicable to it, and La.R.S. 13:3714 does not transform it into admissible evidence. *Id*. Accordingly, it was error for the trial court to allow it to be introduced into evidence.

Betty also argues that allowing the memorandum into evidence violated the collateral source rule. "Under the collateral source rule, a tortfeasor may not benefit, and an injured plaintiff's tort recovery may not be reduced, because of monies received by the plaintiff from sources independent of the tortfeasor's procuration or contribution." *Bozeman v. State, Dep't of Transp. & Dev.*, 03-1016, p. 1 (La. 7/2/04), 879 So.2d 692, 693. While the memorandum indicates that Betty's attorney was paying her medical expenses, there was no evidence that Betty was not obligated to reimburse her attorney for those expenses. Accordingly, we find that the prepayment of medical expenses by her attorney does not satisfy the collateral source rule. Even, if the memorandum did violate the collateral source rule, the trial court's ruling in this respect was harmless, as the jury awarded all of Betty and Johnathan's medical expenses.

Betty next argues that introduction of the memorandum violated La.Code Evid. art. 411, which provides that the amount of a liability insurance policy is not to be communicated to the jury unless the amount of coverage is disputed. The memorandum indicates that the limits of Progressive's policy are "big," but it does not disclose the amount of the policy.

Article 411 was enacted in response to the urging of the insurance industry that it was "'extremely prejudicial'" to their interests, not plaintiffs' interests, for jurors to know how much insurance was available. *Steers v. Int'l Paper Co.*, 540 So.2d 1236, 1241 (La.App. 3 Cir.), *writ denied*, 543 So.2d 20 (La.1989). Betty cites *Steers*

6

as support for her argument. In *Steers*, this court determined that the trial court's admission of information that the plaintiff had settled with an insurer and was paid its policy limits, when that insurer was stated to be the only insurer in the case, violated Article 411 and was prejudicial to the plaintiffs. The situation in *Steers* is not analogous to Betty's situation. We conclude that the trial court's admission of the memorandum does not violate La.Code Evid. art. 411.

### *Defendant Driver's Injuries*

During his opening statement, defense counsel stated that Ross "wasn't hurt. He hurt for two days." Betty's attorney objected, and referencing a pre-trial motion *in limine*, he urged that the reference to Ross's injuries was improper. Counsel approached the bench and conferred with the trial judge. This conference must not have been recorded because it is not in the record. Defense counsel resumed his opening statement and did not refer to Ross's injuries again. Moments later, defense counsel stated that Betty hired her attorney within five days of the accident; Betty's attorney objected again.

This time the jury was removed, and the argument of counsel was recorded. Defense counsel stated that he did not realize or had forgotten that reference to injuries other than the plaintiffs' was addressed in the motion *in limine*, and he apologized for violating the order. The trial court ruled that, in spite of its prior ruling on the motion *in limine*, Ross's injuries or lack of injuries were relevant and defense counsel could reference them.

There are many varying factors in an automobile accident that determine the injuries and extent of injuries a person suffers as a result of the accident. It is not unusual for one person in an automobile accident to suffer minor injuries while

7

another person in the same vehicle suffers life-altering or even fatal injuries. Accordingly, the type and extent of the injuries suffered by one person is not relevant to determining the validity of the type and extent of the injuries suffered by another in the same accident, and the trial court erred ruling that it was.

We do observe, however, as noted above, that defense counsel made no further reference to Ross's injuries. Further, we are of the opinion that the variation in the types and extent of injuries suffered by individuals involved in the same accident is common knowledge learned through common experience and that the jury would have applied this common knowledge to Betty and Johnathan.

### Betty's Hiring of Counsel

As indicated above, defense counsel related to the jury that Betty retained her attorney's services five days after the accident. Betty asserts that the trial court erred in allowing him to do so and then preventing her counsel from exploring the reasons that she contacted him when she did. She asserts that Progressive's Emergency Response Team began contacting her immediately after the accident and that, because she felt like she was being harassed, she sought the advice of an attorney. When her attorney attempted to elicit this information from her, defense counsel objected, and the trial court sustained the objection because Betty could not identify the Progressive employee or employees who made the calls or when the calls were made.

The purpose of Betty's testimony was to explain why she sought the advice of an attorney five days after the accident in the face of inferences that she did so only because she was interested in money. Her testimony was clearly relevant for this purpose. Furthermore, she was not attempting to establish the truth of the matter asserted but was trying to explain her actions. Accordingly, it was not hearsay. *See*

*State v. Bennet*, (La.App. 3 Cir. 1993), 617 So.2d 550. The trial court erred in allowing Progressive to question Betty on this issue but refusing to her allow to explain her actions.

***Defense Counsel's Comments re: Plaintiffs' Medical Treatment***

Betty next contends that the trial court erred in allowing defense counsel to make "disparaging" comments about her counsel to the effect that he "orchestrated" the medical treatment in this case. She further argues that defense counsel's comments equate to a claim that her attorney committed fraud in his representation of her and that, without an affirmative allegation of fraud, the comments were improper and should not have been allowed. There are numerous instances of these comments throughout the record. We do not agree that defense counsel's comments equate to allegations of fraud.

Betty's attorney addressed these comments during the trial by asking her physicians whether they would alter their normal course of practice or treatment to assist a patient in obtaining a larger settlement or award. Each responded clearly and emphatically that he would not jeopardize his personal and professional reputation by engaging in such practices and made it clear that every patient is treated equally, according to the patient's complaints and his medical findings. Additionally, we believe the common experience of the jurors would have led them to conclude that these physicians would not engage in such practice and that defense counsel's arguments were unfounded.

***Updated Medical Records***

During cross-examination of Betty, defense counsel showed her a portion of her medical records from the Lafayette Bone and Joint Clinic, Drs. Blanda and

Hodges' office. The certification which accompanied the records had been altered: the word "complete" in the phrase "certified complete copy" had been stricken. Defense counsel asked Betty if she knew who altered the certification; she answered "no." On redirect examination, Betty's attorney attempted to show that the certification had been altered by personnel of the Lafayette Bone and Joint Clinic by showing Betty a copy of a letter by defense counsel to the Clinic in which he requested "updated" records. Defense counsel objected, arguing that a proper foundation had not been established for Betty to testify regarding the letter and its contents. The trial court agreed because Betty had no knowledge of the letter.

Betty argues that the trial court's refusal to allow her to present evidence to establish why the certification had been altered was error. The trial court did not refuse to allow Betty to establish why the certification was altered; it refused to allow her do so through her own testimony because she had no knowledge of either document. We agree with the trial court that Betty was not the proper person to establish why the alteration was made and find no error with this ruling.

### *Judicial Notice*

Betty sought to have the trial court take judicial notice of information concerning the wages of eight particular jobs on a website maintained by the U. S. Department of Labor, Bureau of Labor Statistics. This request was in conjunction with her claims that she and Johnathan suffered a loss of earning capacity as a result of the accident. The trial court denied the request. She urges this was error.

Pursuant to La.Code Evid. art. 201(D), judicial notice is discretionary except when the court is "supplied with the information necessary for the court to determine

10

that there is no reasonable dispute as to the fact" for which judicial notice is sought. Judicial notice is not mandatory here.

The trial court entertained lengthy arguments on this issue. The trial court and opposing counsel identified concerns, including: the request and the information sought to be introduced were not provided to opposing counsel and the trial court until the day before the trial started and opposing counsel attempted to retrieve the information Betty wanted to introduce from the website but was unable to do so.

Betty cites *State v. Carpenter*, 00-436 (La.App. 3 Cir. 10/19/00), 772 So.2d 200, *writ denied*, 00-3152 (La. 1/25/02), 806 So.2d 665, in support of her claim that the trial court erred in refusing to take judicial notice of the requested information. In *Carpenter,* this court took judicial notice of a specific fact, the defendant's status as a commissioned police chief, from a website established and maintained by the Louisiana Secretary of State pursuant to a constitutional mandate.

This court reviewed the website at issue and found that wage information for at least one of the eight identified jobs was compiled on a national basis, a state-by-state basis, and a metropolitan basis for those areas with the highest concentration of these jobs. The information included median and mean wages for this job in a minimum of three different industries. This is much different from the situation in *Carpenter*; the specificity present there is not present here. Without sufficient time for the trial court and opposing counsel to satisfy their concerns regarding the information sought to be provided to the jury and to determine the exact information which would be appropriate to present to the jury, we find no error in the trial court's refusal to take judicial notice of the requested information.

11

*Prejudice*

We have determined that the trial court did commit errors in ruling on some of the evidentiary matters presented during the trial. Betty urges that these errors, when considered *in toto*, require us to consider this matter *de novo*. With regard to the assignments of error directed to the objectionable comments made by defense counsel in his opening and/or closing statements, the trial court instructed the jury that statements of the attorneys were not evidence, and counsel reiterated this in their arguments. The trial court's instructions and counsel's acknowledgment of the instructions, together with the evidence in the record all served to lessen whatever prejudicial impact the statements may have had. *Hebert v. Hartford Ins. Co. of the Midwest,* 94-316 (La.App. 3 Cir. 11/2/94), 649 So.2d 631. *See also Hebert v. Domingue*, 473 So.2d 120 (La.App. 3 Cir.), *writ denied*, 477 So.2d 708 (La.1985).

The Defendants acknowledged to the jury that Betty and Johnathan were injured in the accident, that they are liable to Betty and Johnathan for injuries caused by the accident, and that Betty and Johnathan are entitled to be compensated for their injuries. Using Betty and Johnathan's medical records and treating physicians' testimony, as well as their own medical expert, the Defendants successfully questioned whether all of Betty and Johnathan's claimed injuries were legitimate and caused by the accident. We have reviewed the medical evidence and find that it provides a reasonable basis for the jury's verdict. Therefore, we cannot conclude that the trial court's erroneous evidentiary rulings prejudiced or tainted the jury's verdict.

**Damages**

Betty and Johnathan bear the burden of proving a causal relationship between the accident and their alleged injuries. *Am. Motorist Ins. Co. v. Am. Rent-All, Inc.,*

12

579 So.2d 429 (La.1991). This burden can be met by proving through medical and lay testimony that it was more probable than not that their injuries were caused by the accident. *Maranto v. Goodyear Tire & Rubber Co.*, 94-2603, 94-2615 (La. 2/20/95), 650 So.2d 757. Whether the accident caused their injuries is a factual question which should not be reversed on appeal absent manifest error. *American*, 579 So.2d 429; *Rosell*, 549 So.2d 840.

A plaintiff may ordinarily recover reasonable past and future medical expenses that result from the tortfeasor's conduct. *Dauzat v. Canal Ins. Co.*, 96-1261 (La.App. 3 Cir. 4/9/97), 692 So.2d 739. The plaintiff is also entitled to recover the full amount of medical expenses incurred as a result of the accident, when such expenses were occasioned in good faith, even if the fact finder determines that some of the expenses did not result from the tortfeasor's conduct. *Mustiful v. Strickland*, 98-1294 (La.App. 3 Cir. 4/7/99), 732 So.2d 741, *writ denied*, 99-1245 (La. 6/18/99), 745 So.2d 29.

Expert medical testimony was very important in this case. The effect and weight to be given to expert testimony rests within the broad discretion of the trier of fact. *Williams v. City of Monroe*, 27,065, 27,066 (La.App. 2 Cir. 7/3/95), 658 So.2d 820, *writs denied*, 95-1998, 95-2017 (La. 12/15/95), 664 So.2d 451, 452. Credibility determinations, including the evaluation and resolution of conflicts in expert testimony, are factual issues to be resolved by the trier of fact, which should not be disturbed on appeal in the absence of manifest error. *Lasyone v. Kansas City S. R.R.,* 00-2628 (La. 4/03/01), 786 So.2d 682.

### *Betty*

The jury awarded Betty the following damages. She urges that all of the awards, except the award for past medical treatment, are inadequate.

13

General Damages:

| | | |
|---|---|---|
| 1. | Past & Future pain and suffering | $ 20,000.00 |
| 2. | Past & Future mental anguish | 15,000.00 |
| 3. | Past & Future loss of enjoyment of life | 2,500.00 |
| 4. | Past & Future loss of physical function and disability | 2,500.00 |

Special Damages:

| | | |
|---|---|---|
| 5. | Past medical expenses | 72,909.00 |
| 6. | Future medical expenses | 5,820.00 |
| 7. | Past lost wages | 0.00 |
| 8. | Future loss of wages or earning capacity | 0.00 |

Loss of Consortium

| | | |
|---|---|---|
| 9. | Loss of consortium from injuries to Johnathan Vaughn | 0.00 |

Betty argued to the jury that she received injuries to her head, neck, back, left and right brachial complex, and left temporomandibular joint (TMJ) in the accident which caused neck and back strain, a displaced disc in her left TMJ, a traumatic brain injury, and thoracic outlet syndrome (TOS). She was initially treated by Dr. Blanda and treated with him for a few months. She complained of pain in her neck and lower back, as well as some right arm pain. An MRI of her lower back was normal. Dr. Blanda determined that she had muscle and ligament injuries and recommended conservative treatment, including muscle relaxers, pain relievers, anti-inflammatory medications, and physical therapy. He also recommended that she be evaluated by a dentist for a possible problem with her left TMJ. In August 1999, Betty saw Dr. Pearce who determined that the disc in her left TMJ was displaced. He recommended that she follow a soft diet and prescribed splint therapy for her jaw. She did not undergo the splint therapy.

Betty did not feel like Dr. Blanda was addressing her complaints, and she sought the opinion of Dr. Llewellyn. Dr. Llewellyn agreed with Dr. Blanda's assessment of Betty's injuries, as well as his treatment plan, and recommended that she continue treatment with Dr. Blanda. She then sought treatment from Dr. Mack, a family physician in Lafayette. Due to the nature of her complaints, neck and back pain, Dr. Mack referred her to Dr. Johnston, an orthopedist associated with his clinic. Dr. Johnston ordered MRI's of Betty's back and neck and a nerve conduction velocity test. The test results were negative. Dr. Johnston was of the opinion that Betty had reached maximum medical improvement in December 2000.

Betty returned to Dr. Blanda, and in March 2001, Dr. Blanda referred her to Dr. Daniel Hodges, a physician in his office who specializes in pain management, due to her continuing complaints of pain. Dr. Hodges ordered MRI's on Betty's neck, back, and brain. The results were negative/normal. Dr. Hodges began to suspect that Betty had TOS because of complaints of pain and numbness in her arms. Dr. Hodges referred her to Dr. Edward Feinberg, a thoracic surgeon in Lafayette. After examining Betty, Dr. Feinberg suspected that she had either severe myofascial syndrome or TOS, and he referred her to Dr. Harold Urschel of Dallas. Betty first saw Dr. Urschel on May 14, 2002. He diagnosed her with TOS and recommended that she have surgery. On August 21, 2002, Dr. Urschel performed surgery on Betty's left thoracic area.

The following issues concerning Betty's medical treatment could have caused the jury to question her credibility and the extent of her injuries. Betty saw Dr. Pearce within two months of the accident. At that time, he determined that she had a displaced disc in her left TMJ and prescribed splint therapy. He testified that a

15

displaced TMJ disc can cause jaw pain, ringing in the ears, headache, muscle spasm, neck pain, dizziness, and disorientation. Betty did not undergo the splint therapy recommended by Dr. Pearce.

Betty's failure to undergo the splint therapy is especially troublesome with regard to her complaints of traumatic brain injury because many of her complaints that served as the basis for her claim of brain damage, e.g., headaches, dizziness, ringing in the ears, and disorientation, are the same symptoms that Dr. Pearce testified could be the result of a displaced TMJ disc. Dr. Pearce also testified that 98% of displaced TMJ discs are successfully treated with splint therapy. Betty's failure to undergo the therapy may have caused the jury to question whether her complaints of jaw pain, ringing in the ears, headache, muscle spasm, neck pain, dizziness, and disorientation would have been alleviated with splint therapy. Consequently, it may have caused the jury to doubt her objectives and, more importantly, her credibility in this litigation.

Furthermore, although Betty argued to the jury that she suffered a brain injury in the accident, many of the symptoms of brain damage that she claimed she has are not documented in her medical records, and none of her treating physicians, until Dr. Hodges more than two years after the accident, suggested that the accident may have caused a brain injury. She was not referred to a neuropsychiatrist or other specialist for testing and a diagnosis for her symptoms or complaints prior to trial. Additionally, the Defendants identified inconsistencies in her complaints and her actions. For example, Betty testified that after the accident her eyes were very sensitive to light, a symptom of brain damage, and that she often had to wear

16

sunglasses while indoors. However, when she went to purchase new contacts, she did not relate these complaints to her eye doctor.

The diagnosis of TOS and surgery by Dr. Urschel is also problematic. Dr. Urschel described TOS as involving the nerves and blood vessels crossing the top of the chest under the collarbone; it can involve the compression of nerves, the compression of blood vessels, or both. It may or may not be traumatically induced. Dr. Urschel testified that TOS is hard to diagnose and that a lot of doctors do not see enough cases to recognize it. He further testified that a lot of neurologists do not believe the condition exists.

Dr. Urschel testified that, during Betty's first visit with him, there were clinical signs and symptoms of vascular insufficiency in both of her arms, which were greater on the left than on the right. Symptoms of TOS he identified as being present in Betty that day were: blue fingers; her dominant left hand was one-half as strong as her right hand; temperature change in both of her hands; and when moved in any position of function her hands would turn white. On that date, he and another doctor in the same clinic performed nerve velocity conduction tests, which he testified led to his diagnosis of TOS. He explained the surgery in detail and testified that it revealed extensive scarring which "froze" Betty's nerves and blood vessels in her chest and caused her pain and other symptoms.

The Defendants presented evidence which questioned Dr. Urschel's diagnosis of TOS, the causation of it, and the necessity of the surgery. On cross-examination, Dr. Blanda testified that he had previously diagnosed TOS in patients, but he did not suspect Betty had TOS, and there is no indication in Dr. Llewellyn's, Dr. Mack's, or Dr. Johnston's records that any of them suspected TOS. The condition was not

suspected for more than two years after the accident until Betty was being treated by Dr. Hodges.

Dr. Robert Tiel, a neurosurgeon, testified on behalf of the Defendants. Dr. Tiel did testify that some of Betty's complaints were consistent with TOS and that it was reasonable to consider the diagnosis. However, he further testified that her complaints did not fit the criteria of traumatically-induced TOS, explaining that there is usually a pretty immediate loss of function in those situations, as well as pain in the arms, color changes, and swelling immediately after the accident, which were not present here. Dr. Tiel also explained that his review of Betty's medical records did not reveal consistent complaints of symptoms indicative of TOS and that a patient's complaints do not usually migrate.

Dr. Tiel also testified that, if Betty did in fact have TOS, she should have been treated with physical therapy instead of surgery because the surgery is controversial and its success rate is seriously questioned. In this respect, Dr. Urschel testified that he did not recommend physical therapy for Betty because she had already had physical therapy. However, Dr. Tiel testified that Betty's physical therapy was directed to her complaints of neck and back pain and that physical therapy for TOS is different. Dr. Urschel also admitted on cross-examination that the recurrence of symptoms after TOS surgery is nearly 50%.

Throughout his testimony, Dr. Tiel questioned Dr. Urschel's legitimacy. On cross-examination, which was combative, he testified that he believes the nerve conduction studies performed and relied upon by Dr. Urschel as a basis for TOS surgery are intellectually dishonest. Dr. Tiel also testified that a number of years ago Dr. Urschel had prepared an article for the *New England Journal of Medicine,*

18

reporting the results of nerve velocity conduction studies he conducted to diagnose TOS. When other laboratories could not reproduce the same results, the *Journal* chastised the testing as a fabrication.

Having reviewed the medical evidence, we cannot say that the jury's verdict was tainted by the trial court's erroneous evidentiary rulings. Betty's medical evidence is conflicting in many aspects. Her credibility and the credibility of one of her expert witnesses was challenged. It was the jury's duty and province to determine the credibility of the evidence, including the parties and the experts. Finding no manifest error, we cannot disturb the jury's findings.

### *Johnathan's Damages*

The jury awarded Johnathan damages as follows:

General Damages:

| | | |
|---|---|---|
| 1. | Past & Future pain and suffering | $ 15,000.00 |
| 2. | Past & Future mental anguish | 10,000.00 |
| 3. | Past & Future loss of enjoyment of life | 5,012.00 |
| 4. | Past & Future loss of physical function and disability | 0.00 |

Special Damages:

| | | |
|---|---|---|
| 5. | Past medical expenses | 28,006.00 |
| 6. | Future medical expenses | 2,000.00 |
| 7. | Past lost wages | 0.00 |
| 8. | Future loss of wages or earning capacity | 0.00 |

Loss of Consortium:

| | | |
|---|---|---|
| 9. | Loss of consortium from injuries to [Betty] Vaughn | 2,500.00 |

Johnathan contends that the jury's awards for general damages and future medical expenses are woefully inadequate in light of his knee injuries and brain injury. He asserts that he should have been awarded $573,325.11 for future medical

19

expenses relating to his knees and $61,764.60 for medical expenses relating to his brain injury.

We find no error with the jury's refusal to award Johnathan future medical expenses or general damages for his claim of mild traumatic brain injury. As with Betty, none of Johnathan's complaints to his physicians suggested post-concussion syndrome or mild traumatic brain injury until he saw Dr. Hodges in June 2001. Johnathan was examined by Dr. Llewellyn in 1999. Dr. Llewellyn found no objective signs of brain injury but ordered an MRI of Johnathan's brain to allay the family's fears of such an injury. The MRI was normal. Dr. Hodges testified that Johnathan's complaints suggested the possibility of post-concussion syndrome, and he recommended testing to determine if he had suffered a brain injury. The testing was not done before trial. Dr. Llewellyn's objective findings and the normal brain MRI in 1999 provided a reasonable basis for the jury to conclude that Johnathan failed to satisfy his burden of proof on this issue.

Dr. Blanda testified that, based on the history Johnathan related to him, Johnathan's knee injuries were related to the accident. Dr. Blanda explained that the torn cartilage in Johnathan's knees is commonly called "dashboard injuries" and that this condition is not congenital or an aging problem and is related to some type of injury. Further, he explained that such injury may start small and increase over time with everyday wear and tear such that eventually the injury progresses to a point where surgery is necessary.

The Defendants dispute the accident as the cause of Johnathan's knee injuries and point out that there are no complaints of knee pain in his medical records until twenty-two months after the accident, yet Johnathan told Dr. Blanda in April 2001

that his knee pain developed shortly after his accident. With regard to this complaint, the Defendants also point out that Johnathan's first complaint of knee pain was made to Dr. Blanda during his first office visit following a conference by his attorney with Dr. Blanda and that Johnathan questioned Dr. Johnston about resuming jogging in December 2000. When cross-examined regarding his opinion that the accident caused Johnathan's knee injuries, Dr. Blanda testified that his opinion was based on Johnathan's report to him of knee pain since the accident. We further observe that Jonathan indicated he had knee pain for six months on an August 13, 2001 Symptoms Questionnaire, completed in conjunction with the MRI's of his knees.

Dr. Johnston's medical records do reveal that Johnathan complained of radiating pain or referred pain from his lower back to his knee in April 2000. However, Dr. Blanda explained that his review of this record indicated these complaints were not of pain in the knee itself but of pain radiating from Johnathan's lower back down his right leg to his calf.

The question of exactly when Johnathan began experiencing pain in his knees—immediately after the accident, as he related to Dr. Blanda in April 2001 or in early 2001, as he indicated on an August 2001 "Symptoms Questionnaire" for an MRI of his knees—coupled with his interest in resuming jogging in December 2000 provided the jury a reasonable basis to conclude that he did not prove his knees were injured in the accident.

Johnathan also argues that the jury erred in failing to award him the remainder of the future medical expenses he sought and damages for loss of earning capacity. Finding no error with the jury's rejection of his claim that his knees were injured in the accident, we need not address these issues.

21

### *Disposition*

The verdict of the jury is affirmed.  All costs of this appeal are assessed to Betty Vaughn.

**AFFIRMED.**